**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                                :
ABDUL HAKIM SALAAM,             :
                                :        Civil Action No. 02-782 (DRD)
              Petitioner,       :
                                :
         v.                     :
                                :            **OPINION**
DEPARTMENT OF CORRECTIONS,      :
et al.,                         :
                                :
              Respondents.      :
_____:
```

**APPEARANCES:**

ABDUL HAKIM SALAAM, Petitioner <u>Pro</u> <u>Se</u>
# 265182
Northern State Prison
168 Frontage Road
Newark, New Jersey 07114

DONALD C. CAMPOLO, ESQ.
Office of the Essex County Prosecutor
Essex County Courts Building
Newark, New Jersey

MARK PAUL CRONIN, ESQ.
Office of the New Jersey Attorney General
Division of Criminal Justice, Appellate Section
P.O. Box CN 086
Trenton, New Jersey 08625
Attorneys for Respondents

**DEBEVOISE, District Judge**

This matter is before the Court on petitioner Abdul Hakim

Salaam's application for habeas corpus relief under 28 U.S.C. §

2254.  For the reasons stated below, the petition for habeas

relief will be denied for failure to make a substantial showing of a federal statutory or constitutional deprivation.

I.   BACKGROUND

A.   Procedural History

Petitioner, Abdul Hakim Salaam ("Salaam"), is currently confined at the Northern State Prison in Newark, New Jersey.  He pled guilty to a charge of manslaughter as a juvenile in the Superior Court of New Jersey, Family Part, Essex County on or about December 17, 1987, and was sentenced to an indeterminate prison term of twenty (20) years.  Salaam admits that he did not appeal from his juvenile conviction, but explains that at eleven (11) years of age, he did not understand his rights, or the implications of his guilty plea.  (Petition, ¶¶ 1-9).

The habeas petition also appears to allege that Salaam filed a state court motion for modification of his sentence sometime in 1998 and 1999.  (Pet., ¶ 9(f)).  Salaam submitted the instant petition for federal habeas relief on or about February 20, 2002.

The respondents filed a motion to dismiss the petition on October 17, 2002.  In their motion papers, the respondents confirm that no appeal was ever filed by Salaam in the Law Division or Appellate Division of the Superior Court of New Jersey.  They also contend that there is no record of a petition for certification with the New Jersey Supreme Court.

2

However, respondents do concede that Salaam sent a letter to the Honorable Philip Freedman, dated November 15, 1994, regarding the status of his case; and that the Honorable Michael J. Degnan, J.S.C. responded by noting that the Honorable B. Thomas Leahy, J.S.C. (now retired) had reviewed the matter in 1990 and "saw no reason to change the disposition." Judge Degnan likewise declined to revisit the disposition in December 1994. (Respondents' Motion, Exhibit Ra 2).

The Court denied the motion to dismiss by Opinion and Order entered on March 31, 2003. (Docket Entry Nos. 9, 10). The Court further ordered the respondents to answer the claims presented in the petition and to provide the relevant record. (Docket Entry No. 10).

The respondents answered the petition on June 18, 2003. In their answer, the respondents again attest that they could find no evidence of an appeal by Salaam to the Superior Court of New Jersey, Appellate Division or a petition for certification to the Supreme Court of New Jersey. Further, there was no evidence that petitioner had filed an application for post-conviction relief in state court. (Resp. Answer at ¶ 8).

Finally, the respondents note the unique situation of this case involving a juvenile offender convicted of homicide at the

3

age of 11 and the lack of a state court procedural history record.[1]  (Answer at ¶ 12).

B.  <u>Factual Background</u>

Salaam was an 11 year old juvenile when he was convicted of killing a 37 year old male victim by setting him on fire while the man slept on a public bench.  (Juvenile Delinquency Complaint, Exhibit A, Ra4; Ra16).  Salaam was initially charged with aggravated assault, which charge was then superceded with a homicide charge after the victim subsequently died from the severity of his burns and smoke inhalation.  (Ex. B; Ra1-4).

On August 14, 1987, Salaam was taken into custody and questioned by the police.  During the two hours he was held by the police, and before he was sent to the youth house, Salaam gave several versions of the crime.  He eventually admitted his guilt, first to his father and then to the police.  (Ex. A, Ra65-67; Ra42-44).  Petitioner was sent to the Elizabeth General

---

[1]  The respondents note that because Salaam was a juvenile at the time of his offense, he was afforded all of the safeguards of confidentiality required for juvenile offenders, thus making it difficult to obtain records and documentation related to his juvenile court proceedings.  Tapes and transcripts of Salaam's plea and sentence hearings were destroyed by the State after the requisite five year period to maintain records expired.  No transcripts had been ordered for appeal purposes, which likely would have preserved the record.  (Resp. Ex. G, Ra1-2).  Under these circumstances, the State acknowledges that the Court may elect to remand the case to the state court for a hearing to expand and reconstruct the plea and sentence proceedings.  (Resp. Ex. G, Ra7-9).  Because the Court finds no merit to any of petitioner's claims, a remand for reconstruction of the plea hearing is not warranted.

Hospital for evaluation and then to the Essex County Youth House pending a hearing in Juvenile Court.  (Ex. D, Ra2).  The Division of Youth and Family Services ("DYFS") was contacted.  (Ex. D, Ra38-53).  Salaam was evaluated by psychiatrists for the prosecution, the defense, and by DYFS.  (Ex. C, Ra1-39).

The matter was scheduled for trial before the now-retired Honorable B. Thomas Leahy, J.S.C.  Salaam was represented by Assistant Deputy Public Defender Paul Bini.  On the first day of trial, in October 1987, Salaam pled guilty to the homicide charge pursuant to a plea agreement, which dismissed other charges of assault and criminal mischief.  (Ex. A, Ra1-3; Ra6-10; Ra11-13; Ra14-15; Ex. D, Ra3).  On December 17, 1987, Judge Leahy sentenced Salaam to a 20 year indeterminate prison term.[2]

After sentencing, Salaam was placed at the Arthur Brisbane Child Treatment Center for clinical assessment and evaluation of his needs for treatment of his psychological condition, and for transition to the New Jersey Training School for Boys.  (Ex. C, Ra42-54; Ex. D, Ra7; Ra10).  The court ordered a special program for Salaam until his 14th birthday.  (Ex. D, Ra4-Ra5; Ra9; Ra10).

Salaam has been confined in several institutions since his initial placement due to disciplinary problems, as follows: the Boys Training School in Jamesburg; the Lloyd McCorkle Home for

---

[2]  The court discussed the aggravating and mitigating factors determined in reaching the imposed sentence after reviewing the pre-disposition report.  (Ex. D, Ra3; Ra11-22).

Boys from 1989-1990; the Garden State Reception Center in 1993; the Albert C. Wagner Youth Correctional Facility in 1994; New Jersey State Prison in 1994, 2002; East Jersey State Prison in 1996, 1997, 1999 and 2000; Northern State Prison in 1998 and 2001; and South Woods State Prison in 2001.  Salaam is presently incarcerated at Northern State Prison.

In correspondence dated May 16, 2003, New Jersey Department of Corrections ("NJDOC") Classification Officer Cassandra DeChristi confirmed that, pursuant to NJDOC regulations, inmates serving a juvenile sentence term do not receive commutation credits, but they do receive work credits, minimum credits, and presentence jail credits.  Ms. DeChristi further stated that Salaam had not earned any work credit since April 30, 2002, and that he has received numerous disciplinary infractions resulting in his confinement in administrative segregation.[3]  In a "Max Calculation" report dated May 16, 2003, Salaam received 123 days jail credit, 629.9 days work credits, and 111 days minimum credits.  His actual maximum release date is scheduled for August 4, 2005.

## II.  CLAIMS PRESENTED

In his habeas petition, Salaam asserts the following grounds for habeas relief:  (1) his guilty plea was unlawfully induced

---

[3]  Effective May 2001, inmates housed in administrative segregation are not eligible to receive work credits.

and was not voluntarily made with an understanding of the nature
of the charge; (2) his confession was obtained by coercion; (3)
the conviction was obtained by violation of Salaam's privilege
against self-incrimination; (4) ineffective assistance of
counsel; (5) Salaam was denied the right to appeal his
conviction; (6) Salaam is being held illegally by the New Jersey
State Parole (Juvenile) Board due to errors in the calculation of
his work and other commutation credits that have unjustifiably
changed and added time to his juvenile sentence in violation of
his right to due process and the proscription against double
jeopardy; and (7) Salaam requests removal from state prison to a
county jail pending resolution of this matter, for his own
safety.

## III.   EXHAUSTION REQUIREMENT

The State asserts the affirmative defense that Salaam's
petition is unexhausted and procedurally barred.  There is no
evidence that Salaam raised any of the claims now asserted before
the state courts on direct or collateral review.  At most, Salaam
wrote several informal letters to state court judges seeking a
reduction in his sentence as imposed, which were denied by letter
without opinion.  Thus, it would appear that all of the claims

asserted in this petition are unexhausted pursuant to 28 U.S.C. §
2254(b)(1).[4]

Moreover, it would appear that petitioner is procedurally
bared from now bringing his claims in state court on collateral
review.[5]  To overcome this procedural bar in a federal habeas
petition, Salaam must demonstrate cause for the default and

---

[4]  A state prisoner applying for a writ of habeas corpus in
federal court must first "exhaust[] the remedies available in the
courts of the State," unless "there is an absence of available
State corrective process[] or ... circumstances exist that render
such process ineffective ... ."  28 U.S.C. § 2254(b)(1); see also
28 U.S.C. §2254(c); Rose v. Lundy, 455 U.S. 509, 510 (1982);
Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004)(petition for
certiorari filed May 23, 2005).

[5]  Salaam is well beyond the general time limitation imposed
under the New Jersey Post-Conviction Relief Rule 3:22-12 to file
a state post-conviction relief ("PCR") motion.  Rule 3:22-12
allows a petitioner five years from the date of petitioner's
final judgment of conviction to file a PCR application.  However,
Rule 3:22-12 permits relaxation of the five-year time bar if the
petitioner can show that his delay was due to "excusable
neglect".  Petitioner's young age or low I.Q. at the time of his
conviction by guilty plea does not, without more, constitute
"excusable neglect". Ignorance of the law or rules of court does
not establish excusable neglect.  State v. Merola, 365 N.J.
Super. 203, 218 (Law Div. 2002), aff'd 365 N.J. Super. 82 (App.
Div. 2003), certif. denied, 179 N.J. 312 (2004); State v. Murray,
162 N.J. 240, 246 (2000)(lack of sophistication does not satisfy
requirement); State v. Cummings, 321 N.J. Super. 154, 166
(App.Div.), certif. denied, 162 N.J. 199 (1999)(low I.Q. or
inability to speak or read English does not qualify); State v.
D.D.M., 140 N.J. 83, 100 (1995)(defendant's psychological
treatment does not establish excusable neglect unless defendant
can show that his mental state prevented him from filing a
petition within the deadline).

Indeed, a review of New Jersey case law reveals that New
Jersey courts have generally enforced the time bar in a vast
majority of cases.  See Johnson v. Pinchak, 392 F.3d at 561;
Banks v. Horn, 126 F.3d 206, 21 (3d Cir. 1997).

actual prejudice as a result of the alleged violation of federal law, or he must demonstrate that failure to consider his claims will result in a fundamental miscarriage of justice.  See Coleman v. Thompson, 501 U.S. 722, 750 (1991); see also Bousley v. United States, 523 U.S. 614, 622 (1998).  To demonstrate cause, Salaam must show that some objective factor external to the defense impeded his efforts to comply with the state court's procedural rule.  Coleman, 501 U.S. at 753; Murray v. Carrier, 477 U.S. 478, 488 (1986).  To demonstrate prejudice, Salaam also must show that the error infected the entire proceeding and that such error was of constitutional dimension.  Smith v. Murray, 477 U.S. 527 (1986).  The fundamental miscarriage of justice exception is limited to cases that involve a showing of actual innocence. O'Sullivan v. Boerckel, 526 U.S. 838, 854 (1999); Schlup v. Delo, 513 U.S. 298, 321-22 (1995).  In order to demonstrate actual innocence, Salaam must present new, clear and convincing evidence of his innocence.  Schlup, 513 U.S. at 316-17.

A claim of "actual innocence" relates to innocence in fact, not innocence based on a legal, procedural defect.  A petitioner must present evidence of innocence so compelling that it undermines the court's confidence in the trial's outcome of conviction; thus, permitting him to argue the merits of his claim.  In other words, Salaam must show that he did not commit the crime as charged, not simply that some error in procedure

9

occurred.  See Hull v. Freeman, 991 F.2d 86, 91 n.3 (3d Cir. 1993); see also Bousley, 523 U.S. at 624 ("actual innocence" must be "factual innocence", as opposed to procedural insufficiency). A claim of actual innocence requires a petitioner to show (1) "new reliable evidence ... not presented at trial" establishing (2) "that it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence." Wyldes v. Hundley, 69 F.3d 247, 253-54 (8th Cir. 1995), cert. denied, 517 U.S. 1172 (1996).  Moreover, an "actual innocence" claim does not apply to those whose guilt is conceded or plain.  Schlup, 513 U.S. at 321.  Here, Salaam actually pled guilty to the offense charged and has never claimed that he is actually innocent of the homicide charge.

Because Salaam has failed to make any showing of cause, prejudice, or actual innocence, his claims are defaulted, as well as unexhausted.  Nevertheless, the Court may opt to review the allegedly unexhausted, defaulted claims, and deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2).  Section 2254(b)(2) provides that "[a]n application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  Here, the respondents have fully addressed each of petitioner's claims on the merits, as well as asserting affirmative defenses to some of them.  Thus, it is the Court's

preference to deny the instant petition on its merits, pursuant
to 28 U.S.C. § 2254(b)(2), when "it is perfectly clear that an
applicant does not raise even a colorable federal claim."
Lambert v. Blackwell, 134 F.3d 506, 514-15 (3d Cir. 1997), cert.
denied, 532 U.S. 919 (2001).

IV.   MERITS

A.   Standards Governing Petitioner's § 2254 Claims

     The Court recognizes that a pro se pleading is held to less
stringent standards than more formal pleadings drafted by
attorneys. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v.
Kerner, 404 U.S. 519, 520 (1972).  Thus, a pro se habeas petition
should be construed liberally and with a measure of tolerance.
See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v.
Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); Duarte v.
Hurley, 43 F. Supp.2d 504, 507 (D.N.J. 1999).  Because Salaam is
proceeding pro se in his application for habeas relief, the Court
will accord his petition the liberal construction intended for
pro se litigants.

     Under § 2254, as amended by the Anti-Terrorism and Effective
Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas
matters must give considerable deference to determinations of the
state trial and appellate courts.  See 28 U.S.C. § 2254(e);
Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122
S.Ct. 269 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir.

11

1996)(*citing* <u>Parke v. Raley</u>, 506 U.S. 20, 36 (1992)).  Section

2254(d) sets the standard for granting or denying a habeas writ:

> (d)  An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment
> of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim -
>
> > (1)  resulted in a decision that was contrary to, or
> > involved an unreasonable application of, clearly
> > established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an
> > unreasonable determination of the facts in light
> > of the evidence presented in the State court
> > proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the Supreme

Court explained that subsection (d)(1) involves two clauses or

conditions, one of which must be satisfied before a writ may

issue.  The first clause, or condition, is referred to as the

"contrary to" clause.  The second condition is the "unreasonable

application" clause.  <u>Williams</u>, 529 U.S. at 412-13.  In the

"contrary to" clause, "a federal court may grant the writ if the

state arrives at a conclusion opposite to that reached by [the

Supreme] Court on a question of law or if the state court decides

a case differently than [the Supreme] Court has on a set of

materially indistinguishable facts."  <u>Id</u>.  Under the

"unreasonable application" clause, a federal court may grant the

writ if "the state court identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case." Id. at 413.  Habeas relief may not be granted under the "unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief.  Id. at 411.  See also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999), cert. denied sub nom Matteo v. Brennan, 528 U.S. 824 (1999).

Consonant with Williams, the Third Circuit has held that § 2254(d)(1) requires a federal habeas court to make a two step inquiry of the petitioner's claims.  First, the court must examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims.  See Werts, 228 F.3d at 196-97; Matteo, 171 F.3d at 888-891.  If the federal court determines that the state court's decision was not "contrary to" applicable Supreme Court precedent, then the court takes the second step of the analysis under § 2254(d)(1), which is whether the state court unreasonably applied the Supreme Court precedent in reaching its decision.  Werts, 228 F.3d at 197.

This second step requires more than a disagreement with the state court's ruling because the Supreme Court would have reached a different result. Id. AEDPA prohibits such *de novo* review. Rather, the federal habeas court must determine whether the state court's application of the Supreme Court precedent was objectively unreasonable. Id. In short, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent. Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence. See Duncan, 256 F.3d at 196 (*citing* 28 U.S.C. § 2254(e)(1)). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

B.  Claims Involving the Confession and Guilty Plea

In Grounds One, Two, and Three of the petition, Salaam asserts that his guilty plea was not voluntarily or knowingly

14

made; that his plea was the result of a coerced confession; and
that he should have been advised not to incriminate himself. The
Court construes these allegations as asserting a violation of
Salaam's Fifth Amendment rights against self-incrimination. The
claims also implicate the due process clause of the Fourteenth
Amendment.

    1. *The Guilty Plea*

    Due process requires that guilty pleas be entered knowingly
and voluntarily. See, Boykin v. Alabama, 395 U.S. 238, 242
(1969). A guilty plea entered by one fully aware of the direct
consequences of the plea is voluntary "'unless induced by threats
(or promises to discontinue improper harassment),
misrepresentation (including unfulfilled or unfulfillable
promises), or perhaps by promises that are by their nature
improper as having no proper relationship to the prosecutor's
business (e.g. bribes).'" Brady v. United States, 397 U.S. 742,
755 (1970) (quoting Shelton v. United States, 246 F.2d 571, 572
n.2 (5th Cir. 1956) (en banc), rev'd on confession of error on
other grounds, 356 U.S. 26 (1958)). The Court of Appeals for the
Third Circuit has held that the only direct consequences relevant
to evaluating the voluntariness of a guilty plea are the maximum
prison term and fine for the offense charged. See Parry v.
Rosemeyer, 64 F.3d 110, 114 (3d Cir. 1995), cert. denied, 516
U.S. 1058 (1996), superseded by statute on other grounds as

stated in <u>Dickerson v. Vaughn</u>, 90 F.3d 87 (3d Cir. 1996).  A
guilty plea is made intelligently only if a criminal defendant
receives "'real notice of the true nature of the charge against
him ... .'" <u>Bousley</u>, 523 U.S. at 618 (quoting <u>Smith v. O'Grady</u>,
312 U.S. 329, 334 (1941)).

The above standards govern the validity of a guilty plea
even when a criminal defendant protests his innocence despite his
entry of a guilty plea.

> [W]hile most pleas of guilty consist of both a waiver
> of trial and an express admission of guilt, the latter
> element is not a constitutional requisite to the
> imposition of criminal penalty [when, as in the instant
> case,] a defendant intelligently concludes that his
> interests require entry of a guilty plea and the record
> before the judge contains strong evidence of actual
> guilt.

<u>North Carolina v. Alford</u>, 400 U.S. 25, 37 (1970).  The Supreme
Court noted further that "[b]ecause of the importance of
protecting the innocent and of insuring that guilty pleas are a
product of free and intelligent choice, various state and federal
court decisions properly caution that pleas coupled with claims
of innocence should not be accepted unless there is a factual
basis for the plea and until the judge taking the plea has
inquired into and sought to resolve the conflict between the
waiver of trial and the claim of innocence." <u>Id.</u> at 38 n.10
(citations omitted).  Applying <u>Alford</u>, the Court of Appeals for
the Third Circuit has held that "there must always exist some
factual basis for a conclusion of guilt before a court can accept

16

an <u>Alford</u> plea." <u>United States v. Mackins</u>, 218 F.3d 263, 268 (3d Cir. 2000), <u>cert. denied</u>, 531 U.S. 1098 (2001).

In this case, there is no claim of innocence on the part of petitioner.  Rather, Salaam contends that he was 11 years old at the time of his arrest and did not understand the consequences of his plea.  Salaam proffers no evidence that his plea was given involuntarily, or under duress or by coercion.  He relies only on his young age at the time and his behavioral problems to support his belated claim that he did not understand his plea.

However, simply because Salaam was a juvenile at the time does not, in and of itself, render him incapable of making a knowing and voluntary waiver of his constitutional right to a trial.  Most courts look to the totality of events and circumstances preceding entry of a guilty plea in determining whether the defendant was informed and understood the nature of the charge.  Some of the factors to be considered include: (1) the complexity of the charge; (2) defendant's age; (3) defendant's record; (4) defendant's intelligence and education; (5) defendant's ability to comprehend what was being said to him; and (6) whether he was represented by counsel.  <u>See</u> <u>United States v. Cefaratti</u>, 221 F.3d 502, 508 (3d Cir. 2000); <u>United States v. Fernandez</u>, 205 F.3d 1020, 1025 (7th Cir. 2000); <u>United States v. Mosley</u>, 173 F.3d 1318, 1322-23 (11th Cir. 1999); <u>United States v. Marks</u>, 38 F.3d 1009, 1012 (8th Cir. 1994).

In its answer to the petition, the State acknowledges Salaam's young age, intellectual limitations, and his use of medication at the time of his offense. Salaam attended the Samuel Berliner School in Newark where he was a special education student and was classified as emotionally disturbed. Nevertheless, the State contends that the guilty plea was knowingly and voluntarily given without coercion.

The record shows that before a guilty plea was entered, Salaam was evaluated by several psychiatrists with respect to Salaam's mental state. Dr. Paul Kennedy, the Medical Director at UMD-NJ/CMHC Child and Adolescent Unit examined Salaam for purposes of determining the boy's need for psychotropic medication. Dr. Kennedy concluded that Salaam was hyperactive with learning problems, but presented no evidence of psychosis. Salaam was placed on medication and therapeutic counseling to treat his anxiety and impulsiveness. (Ex. C, Ra56-57). Dr. Thomas Schreiber, a consulting psychiatrist for the State, found that Salaam functioned in the low-average range of intelligence, but there was no conclusion that he did not understand the seriousness of the crime or that he could not tell right from wrong. (Ex. C, Ra33-35). In fact, it was ultimately determined by all who examined petitioner, that he was not profoundly retarded, he possessed an I.Q. of 86, which is in the low-average range of intelligence, and that he had no evidence of psychiatric

18

symptomatology.  (See Psychiatric/Legal Report on Abdul Salaam,
dated October 20, 1987, prepared by Peter Schiffman, M.D., at Ex.
C, Ra7-16).  Dr. Schiffman, the State's psychiatrist, found
Salaam legally sane at the time of the homicide.  (Ex. C, Ra15-
16).[6]

More importantly, however, Salaam's parents and his counsel
were present at every stage of the juvenile proceedings,
including the plea entry and the sentencing hearing.  There is
nothing in the record to suggest that Salaam was incapable of
giving a factual basis for his plea of guilt and understanding
the consequences of his guilty plea.  Through the numerous,
documented psychiatric evaluations, Salaam reiterated how he
committed the homicide, explaining why he did it and exhibiting
an understanding that what he did was wrong, although he showed
little remorse for his crime.

Furthermore, at his predisposition hearing, the court
ordered that certain persons be present to explain matters to
Salaam and to ensure that petitioner was afforded his rights and
that he understood the legal proceedings.  These persons included
Salaam's parents and his attorney; and also Jacqueline Bartlett,

_____

    [6]  There is evidence that defense counsel had initially
intended to rely on the defense of diminished capacity or
insanity at trial.  However, it appears from the record supplied
by the State that the defense psychiatrist, Dr. Ann Bartlett, did
not prepare a written report before the guilty plea was entered.
(Ex. C, Ra40-41).

a psychiatrist; DYFS caseworker Jabeil Abdul-Haqq; DYFS Assistant
Regional Administrator Martha Curtis; Dr. Joe Cobert; Dr. Paul
Kennedy; Dr. Peter Schiffman, a psychiatrist; and NJDOC official
Jenny Brown.  (Ex. D, Ra3).

Thus, given the totality of events and circumstances that
preceded the entry of young Salaam's guilty plea, in the presence
and with the support of his parents and counsel, the Court
concludes that Salaam's guilty plea was entered voluntarily and
with the requisite knowledge and understanding of its
consequences.  See Bailey v. Weber, 295 F.3d 852 (8th Cir.
2002)(guilty plea was voluntary and knowingly entered despite
defendant's intellectual limitations).  Accordingly, Salaam's
habeas claim that his plea was involuntary is meritless.

In further support of the Court's finding, it is noted that
there was strong corroborative evidence of Salaam's guilt. The
State had several eyewitnesses who had given statements and were
willing to testify at trial that Salaam was the person who set
the victim on fire, causing the victim's death.  Salaam himself
confessed his crime to his stepfather and to the police.  He has
never recanted his confession, nor has he shown remorse for his
crime.[7]  These circumstances likewise support a knowing and

_____

[7]  On many occasions during his psychiatric evaluations,
Salaam sought to justify his act by claiming the victim was a
junkie who deserved to die (Ex. C, Ra12); the victim assaulted
and raped a woman (Ex. C, Ra3); the victim robbed Salaam of money
(Ex. F, Ra7); the victim "was just a man" (Ex. C, Ra14; Ra29;

20

voluntary plea.  Therefore, because there is an adequate factual basis for Salaam's guilty plea, he has failed to make a substantial showing of the denial of a constitutional right, and his claim will be denied.

    2.  *The Confession/Self-Incriminating Statements*

    Salaam suggests that his guilty plea was prompted by a confession that was allegedly coerced, thus making his guilty plea involuntary.  It is well settled that in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that in order to protect an accused's Fifth Amendment right against self-incrimination during the inherently coercive custodial interrogation setting, certain procedural safeguards must be employed.  These safeguards include the explicit warning that the accused "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires."  <u>Miranda</u>, 384 U.S. at 479.

    <u>Miranda</u> provides that the accused may waive his rights, but must do so "voluntarily, knowingly and intelligently.  <u>Id</u>. at 475.  In determining whether there has been a valid waiver of <u>Miranda</u> rights, a court must conduct a two-part inquiry under a

---

Ra20); and a voice inside of him prompted him to kill the victim. (Ex. C, Ra3).  All of these comments by petitioner demonstrate his stated guilt and lack of remorse for the homicide.

totality of the circumstances standard.  Moran v. Burbine, 475
U.S. 412, 421 (1986).  First, the court looks to the
voluntariness of the statement, and whether the waiver was freely
and deliberately given as opposed to being obtained by coercion,
intimidation, or deception.  Id.  Second, the court must consider
whether the waiver was "knowingly and intelligently" made, that
is, whether the accused was fully aware "both of the nature of
the right being abandoned and the consequences of the decision to
abandon it."  Id.

The "totality of the circumstances approach is adequate to
determine whether there has been a waiver even where
interrogation of juveniles is involved."  Fare v. Michael C., 442
U.S. 707, 725 (1979).  This approach includes the evaluation of
the juvenile's age, education, experience, background, and
intelligence, enabling the court "to take into account those
special concerns that are present when young persons, often with
limited experience and education and with immature judgment, are
involved."  Id.  See also Yarborough v. Alvarado, 541 U.S. 652,
124 S.Ct. 2140, 2151 (2004)(the characteristics of the defendant
can include the defendant's age, education, and intelligence, as
well as his prior experience with law enforcement).

Further, "coercive police activity is a necessary predicate
to the finding that a confession is not 'voluntary' within the
meaning of the Due Process Clause of the Fourteenth Amendment."

Colorado v. Connelly, 479 U.S. 157, 167 (1986).  Absent police overreaching, which is causally related to the confession, "there is simply no basis for concluding that a state actor has deprived a criminal defendant of due process of law." Id. at 164.  Thus, beyond the necessary and crucial element of police coercion, courts look to both the characteristics of the accused and the circumstances of the interrogation in considering whether a confession is voluntary.  See, e.g., Withrow v. Williams, 507 U.S. 680, 693-94 (1993)(concluding that the voluntariness of the confession depends upon the totality of circumstances, including police coercion, length and place of interrogation, the accused's maturity, education, physical condition, intelligence, and mental health, as well as 'the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation."); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)(the voluntariness of a statement may often depend on whether the accused's will was overborne, a question that logically turns on the characteristics of the accused).

The Court has carefully reviewed the record and finds that the totality of the circumstances in this case clearly weigh in favor of voluntariness.  Salaam was taken into custody at 10:00

p.m. on August 14, 1987.[8]  He was informed of his rights and his
stepfather was also present and informed of Salaam's rights.
Police reports show that Salaam was questioned for several hours
and was eventually transported to the hospital for evaluation and
to the Essex County Youth House in Newark for custody shortly
after midnight.

While in custody, Salaam gave several versions of the
incident.  After the police had discredited these earlier
versions, Salaam admitted his guilt.  He first confessed to his
stepfather and then to the police.  No formal statements by
Salaam were recorded.  However, a formal statement made by
Salaam's stepfather as to Salaam's confession of the crime was
recorded and transcribed on the afternoon of August 15, 1987,[9]
after Salaam had been transferred to the youth house.  (Ex. A,
Ra65-67).

---

[8]  The police had been looking for a juvenile who met the
description as provided by the victim's family.  A neighbor
called police to alert them that the youth they were looking for
was in front of 260 Prince Street where the incident had
occurred.  When the police arrived at the scene, neighbors
directed them to petitioner' home because Salaam had run home to
change after he heard the police were looking for him.  Upon
arrival at petitioner's home, Salaam's step-father answered the
door and gave permission for the police to interrogate Salaam
after they both were advised of their rights.  (Ra42).

[9]  Salaam's stepfather agreed to talk to the police and told
them that Salaam is a persistent runaway and has suffered from
behavioral disorders.  The stepfather also told the police that
Salaam admitted that he set the man on fire.  (Ra50).

Here, there is no doubt that Salaam's confession was made during custodial interrogation after arrest.  However, the totality of circumstances surrounding the interrogation do not indicate that the confession was coerced.  Here, petitioner was quite young, but his stepfather was notified of the arrest and interrogation, and was available to petitioner as evidenced by Salaam's eventual confession to his stepfather.  Both the petitioner and his stepfather were advised of their <u>Miranda</u> rights.  The time of custody was brief, even though it was late at night, and there is no indication that Salaam was being denied basic needs or creature comforts.  There is no evidence that Salaam was handcuffed.  Significantly, Salaam does not allege that he was harmed or threatened by the police in any way during his custodial questioning.

Courts have often found valid waivers with respect to custodial confessions in cases involving juveniles and persons with low I.Q.s, such as the petitioner here.  <u>See</u> <u>Winfrey v. Wyrick</u>, 836 F.2d 406 (8th Cir. 1987)(valid waiver from 17 year old with low I.Q.), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u>. <u>Winfrey v. Armontrout</u>, 109 S.Ct. (1988); <u>Vance v. Bordenkircher</u>, 692 F.2d 978 (4th Cir. 1982)(valid waiver from 15 year old with I.Q. of 62, no lawyer or parent present), <u>cert</u>. <u>denied</u>, 464 U.S. 833 (1983); <u>Miller v. Maryland</u>, 577 F.2d 1158 (4th Cir. 1978)(valid waiver from 16 year old with respect to a charge of murder); <u>Williams v. Peyton</u>, 404

F.2d 528, 530 (4th Cir. 1968)("youth by itself is not a ground
for holding a confession inadmissible"); United States v. Miller,
453 F.2d 634 (4th Cir. 1972)(valid waiver by 14 year old
defendant), cert. denied, 406 U.S. 923 (1972).  Thus, Salaam's
"youth and intelligence level does not make the confession
involuntary as a matter of law", see Vance, 692 F.2d at 981,
given the totality of the circumstances, which show no police
overreaching, mistreatment, or coercion, and a brief
interrogation period with Salaam's parents notified of his rights
and available to him during questioning.

Moreover, a post-offense, custodial confession must be
corroborated with independent evidence in order to ensure
reliability and truthfulness.  See Smith v. United States, 348
U.S. 147, 152-53 (1954)(purpose is to prevent errors in
convictions based upon untrue confessions alone).  Here, there
was substantial eyewitness evidence establishing that Salaam was
the culprit at the scene of the arson/homicide.  Salaam also
conceded his guilt to his stepfather.  This evidence is
sufficient to corroborate Salaam's confession.

Therefore, based on the totality of the circumstances and
the lack of alleged coercive police activity, there is no merit
to petitioner's claim that his Fifth Amendment right against
self-incrimination was violated, or that his confession was
coerced in violation of the Fifth Amendment or his due process

rights under the Fourteenth Amendment.  Accordingly, the claims
of a coerced confession and violation of his right against self-
incrimination will be denied.

      B.   Ineffective Assistance of Trial

     In Ground Five of the petition, Salaam asserts a claim that
his counsel was ineffective in allowing Salaam to accept a guilty
plea.  The "clearly established Federal law, as determined by the
Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is
the standard for ineffective assistance of counsel as enunciated
in Strickland v. Washington, 466 U.S. 668 (1984).  Under
Strickland, a petitioner seeking to prove a Sixth Amendment
violation must demonstrate that his counsel's performance fell
below an objective standard of reasonableness, assessing the
facts of the case at the time of counsel's conduct.  Id. at 688-
89; Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied,
534 U.S. 973 (2001).  Petitioner also must show that counsel's
substandard performance actually prejudiced his defense.
Strickland, 466 U.S. at 687.  Prejudice is shown if "there is a
reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different.
A reasonable probability is a probability sufficient to undermine
confidence in the outcome."  Id. at 694.  The reviewing court
must evaluate the effect of any errors in light of the totality
of the evidence.  Id. at 695-96.  Thus, the petitioner must

establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim.  <u>Id</u>. at 697.  <u>Keller</u>, 251 F.3d at 418.

In asserting an ineffective assistance of counsel claim in the context of a guilty plea, petitioner must show that his counsel's performance was deficient and that the deficient performance caused petitioner to reach a different decision with respect to his plea.  <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).

As to the first prong asserting deficient performance, Salaam contends that he had behavioral problems and a low intelligence that should have precluded a plea of guilty.  There were many psychiatric evaluations documenting Salaam's mental and emotional state.  However, the record shows that counsel had filed a notice to the state court and to the prosecutor of his intent to rely on a diminished capacity or insanity defense if the case went to trial.  The record also shows that, in these very same psychiatric evaluations, petitioner was determined to be legally sane and that he understood the nature and quality of his crime and that it was wrong.  Furthermore, Salaam's parents were present at every phase of the plea and sentencing hearings in the state juvenile proceedings to aid the petitioner in his understanding of the charges and consequences of a plea. Therefore, under these circumstances there is no indication that

counsel was deficient in his representation of Salaam or in recommending a guilty plea.[10]

To satisfy the "prejudice' prong in evaluating a claim of ineffective assistance of counsel in the context of a guilty plea, petitioner must show that, but for counsel's errors, he would not have pleaded guilty or would have insisted on going to trial. Here, it is plain from the record provided in this case that there was substantial corroborative evidence of eyewitness testimony to prove Salaam's guilt if the matter were to be tried. Salaam's stepfather also gave a statement that confirmed Salaam's own admission of guilt. In addition, the psychiatric evaluations concluded that Salaam was not legally insane at the time he committed the crime, and that he knew and understood the nature and quality of his actions and knew that what he did was wrong. (Ex. C, Ra7).

Thus, it appears that acceptance of a guilty plea served to avoid a trial for which petitioner would likely have been convicted on a charge of first degree homicide, possibly facing a longer term of incarceration. Instead, he was sentenced to an indeterminate juvenile term with a maximum release date of 20

---

[10] There is no transcript of the plea, however, it is not ineffective assistance of counsel to fail to advise a defendant of collateral consequences of a plea, United States v. Banda, 1 F.3d 354 (5th Cir. 1993), or to wrongly predict the ultimate sentence imposed by the court, United States v. Thornton, 23 F.3d 1532, 1533 (9th Cir. 1994).

years.  At the very least, petitioner would have been tried and convicted based on the strong corroborative evidence against him, resulting in the same or similar outcome as achieved by the guilty plea.

Therefore, not having shown any deficiency in his counsel's performance or any resulting prejudice, this claim fails on the merits and will be denied.

C.  Denial of Right to Appeal

In Ground Six, Salaam asserts that he was denied his right to appeal from the conviction because neither he nor his parents knew that he could do so.  There is no transcript of the plea or sentencing hearing to determine whether Salaam was informed of his right to appeal.

Respondents counter that there is no Sixth Amendment right to appeal, which is purely a creature of statute.  Martinez v. Court of Appeal of California, 528 U.S. 152 (2000).  However, if the state establishes an appellate process, it must be accessible and available to all.  Chaffin v. Stynchcombe, 412 U.S. 17 (1973).

New Jersey has established an appellate process as set forth in the New Jersey Court Rules.  This established process contemplates one appeal as of right to a court of general appellate jurisdiction.  N.J. Court Rule 2:4-1(a).  The rules

also require that the defendant be notified of his right to appeal.  Rule 3:21-4(h).[11]

Salaam does not expressly allege that the trial court or his counsel failed to inform him or his parents of his right to appeal.  However, respondents concede that, without a transcript of the plea and sentencing hearings, it cannot be stated with a "absolute assurance" that Salaam was notified of his right to appeal.  Although the case could be remanded to the state court for an evidentiary hearing on this issue, respondents contend that circumstantial evidence from the existing record shows that Salaam and his family were aware of this right to appeal, but declined to assert the right until years later when they were dissatisfied with Salaam's continued incarceration.

For instance, in 1994, Salaam wrote to a state court judge requesting the status of his sentence and a possible reduction. (Ex. D, Ra23-29).  This letter was acknowledged and answered by Judge Degnan.  In addition, the record shows that, in June and July 2002, Salaam sent letters to his plea attorney and to the Office of the Public Defender asking for copies of his conviction and sentence transcripts.  Salaam was informed by the Assistant

---

[11]  Rule 3:21-4(h) reads:

> After imposing sentence, whether following the
> defendant's plea of guilty or a finding of guilty after
> trial, the court shall advise the defendant of the
> right to appeal and, if defendant is indigent, of the
> right to appeal as an indigent.

31

Deputy Public Defender that no files existed in the office with respect to Salaam's case.  (Ex. D, Ra29-32).

Moreover, even if the Court were to assume for argument's sake that Salaam was not apprised of his right to appeal, Salaam can not demonstrate actual prejudice to him as a result of his inability to file an appeal.  "[A] sentencing court's failure to inform a defendant of his right to appeal is subject to harmless error analysis."  Soto v. United States, 185 F.3d 48, 50 (2d Cir. 1999)(*citing* Peguero v. United States, 526 U.S. 23 (1999)).  Therefore, such failure "is a sufficient basis for collateral relief only when the defendant is prejudiced by the court's error."  Id.

First, for the reasons discussed above in this Opinion, under the totality of the circumstances, Salaam's guilty plea was plainly voluntary and knowing and would not have been overturned on appeal, especially given the strong corroborative evidence of petitioner's guilt and the absence of any claim of innocence.  Thus, even if Salaam had filed an appeal, it would have been unsuccessful to have had his plea withdrawn.  Second, as to his claim for a reduction in his imposed sentence, it should be noted that Salaam's sentence to a 20-year indeterminate term of imprisonment made him eligible for early release.  However, Salaam's numerous and repetitive instances of dangerous behavior and disciplinary infractions while incarcerated prevented an

earlier release than that allowed by lawfully applied work and minimum credits.  Thus, if Salaam had filed an appeal for adjustment of his sentence, no court would have found him eligible for early release based on his many serious disciplinary infractions.

Therefore, being unable to demonstrate any real prejudice from the alleged denial of his right to appeal, Salaam claim for habeas relief will be denied.

D.  Miscalculation of Credits Claim

In Grounds Four and Seven of the petition, Salaam argues that his sentence has been extended because of a miscalculation of work and commutation credits.  He contends that this is a violation of his due process rights and his Fifth Amendment right against double jeopardy.  Salaam does not appear to challenge the original sentence as imposed, but does suggest that his status changed at age 14.

A federal court's ability to review state sentences is limited to challenges based upon "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies."  See Grecco v. O'Lone, 661 F.Supp. 408, 415 (D.N.J. 1987) (citation omitted).  Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation.  See Pringle v. Court of Common Pleas,

33

744 F.2d 297, 300 (3d Cir. 1984).  See also 28 U.S.C. § 2254(a);
Estelle v. McGuire, 502 U.S. 62, 67 (1991); Lewis v. Jeffers, 497
U.S. 764, 780 (1990).

     Here, Salaam is not challenging the sentence as imposed, but
rather the execution of the sentence and the alleged
miscalculation of credits which would result in an earlier
release from prison.  As noted above, it appears that the
proscribed federal constitutional ground asserted by Salaam is
based on the proscription against double jeopardy and a denial of
due process.

     The Double Jeopardy Clause of the Fifth Amendment provides
that no person shall "be subject for the same offence to be twice
put in jeopardy of life or limb."  U.S. Const., Amend. V.  Thus,
double jeopardy protects against a second prosecution for the
same offense following an acquittal or conviction; and it
prohibits multiple punishments for the same offense.  See United
States v. Jorn, 400 U.S. 470, 484 (1971); Arizona v. Washington,
434 U.S. 497, 503 (1978); Stiver v. Meko, 130 F.3d 574 (3d Cir.
1997).  The habeas petition and the record fail to show an actual
violation of the double jeopardy clause.  There is no charge that
Salaam has been punished again for the same offense.  Rather,
Salaam is claiming that he is serving beyond his term because he
has not been afforded credits to which he claims entitlement.
This is not a violation of double jeopardy.

34

However, the claim that he is serving beyond his imposed sentence, if true, may state a violation of due process claim. The Juvenile Guidelines of the New Jersey Administrative Code ("N.J.A.C."), in effect at the time of Salaam's conviction in 1987, establish the criteria for quarterly reviews, parole hearing procedures, appeals, computation of credits, etc. N.J.A.C. 10A:71-3.1 through 71-4.4.  The State posits that these guidelines comply with due process and that Salaam has received all the credits to which he is entitled.  This Court agrees.

The record confirms that Salaam was sentenced on December 17, 1987, to a twenty-year juvenile prison term.  (Ex. D, Ra5). Consequently, his maximum date of imprisonment would be December 16, 2007.  Salaam's NJDOC Max Calculation Sheet shows that he received 123 days of jail-time credit for the time he was confined before sentencing, (Ex. E, Ra2), bringing his maximum release date to August 15, 2007.  In addition to jail-time credit, Salaam was also entitled to receive work credits and minimum credits to be deducted from his maximum release date. See N.J.A.C. 10A:71-3.31(b)-(d).  However, he was ineligible to accrue work credits and minimum credits during the time he was confined in administrative or disciplinary segregation.  Further, as a juvenile offender, Salaam was not entitled to receive commutation credits.  (Ex. E, Ra1).

The State has provided a comprehensive and detailed list of the credits earned by Salaam during his incarceration, from October 6, 1988 through October 30, 2002. (Ex. F, Ra23-30). The record also reports the time Salaam spent in administrative segregation, as well as other factors related to his status and disciplinary matters, which would affect his earlier release from imprisonment.[12] Indeed, the record is replete with numerous accounts of disciplinary infractions, some of which involved sanctioned placement in administrative segregation for periods of time. The Court will not reiterate the many instances of disciplinary segregation, but will instead refer to the record and respondents' answer. (See Answer at pgs. 23-25; Inmate Progress Reports and Notes at Ex. E, Ra15-51; and NJ Parole Board Records at Ex. F, Ra33-89).

Thus, Salaam's NJDOC records show that, as of May 16, 2003, Salaam has earned 629.9 work credits and 111 minimum credits that have been applied to his release date, resulting in a maximum release date of August 4, 2005. (Ex. E, Ra1, Ra2). Minimum credits initially posted for the one year period from January 1999 through December 1999 were removed because Salaam was in administrative segregation during this time and could not earn

---

[12]   The Court notes that on several occasions Salaam was disciplined for forging official documents in an attempt to receive additional credits and being involved in a scheme with an alleged family member to unlawfully credit himself with unearned credits. (Ex. E, Ra90-94).

such credits pursuant to NJDOC regulation.  Discrepancies in the
period from December 1987 to June 1991 were remedied by adding 11
days minimum credits and 175.6 days of work credit.  In general,
however, the overall changes were not beneficial to Salaam.

Moreover, Salaam was informed in writing that he could
submit proofs to Classification if he disputed the calculations.
(Ex. E, Ra4).  Salaam did not do so; rather, he was involved in a
scheme to unlawfully add unearned credits.  (Ex. E, Ra90-94).
Thus, Salaam was aware of the administrative appeal process, as
set forth in N.J.S.A. 10A:71-4.1 through 4.4, but has declined to
exhaust it in a legitimate manner.  He also refused to
participate in his quarterly review hearing on July 23, 2002, and
further stated he would refuse a future parole hearing even
though the Parole Board continued to schedule Salaam's reviews on
a quarterly basis.[13]  (Ex. F, Ra30).  Instead, Salaam has
contacted the NJDOC about the alleged miscalculations on numerous
occasions.  All of these claims were denied without merit.  (Ex.
G, Ra17-19).

Consequently, the Court finds nothing in the record and in
the New Jersey State Parole Board's decisions respecting Salaam's
release date that indicates Salaam has been denied due process

---

[13]   In his complaints to the NJDOC and the Parole Board,
Salaam argued that he should have been released from prison at
age 14, or after serving five years.  The sentence as imposed
does not support this allegation.

with respect to his claim that his maximum release date has been
miscalculated.  He has been given every opportunity to
administratively challenge the calculation of credits, but has
failed to do so properly.  Moreover, the record shows that the
maximum date and applicable credit calculations are accurate and
lawfully applied.  The respondents' decision to keep Salaam
confined in prison for the full term of his imposed sentence,
less lawfully applied credits, is reasonable based on his catalog
of dangerous and disruptive disciplinary infractions throughout
Salaam's incarceration.  See Hunterson v. DiSabato, 308 F.3d 236
(3d Cir. 2002)(the court must determine that a state parole
board's decision was "conscience shocking" or "deliberately
indifferent" in order to find a substantive due process
violation).  Therefore, Salaam's denial of due process claim is
wholly lacking in merit.

Furthermore, the record does not support Salaam's claim that
he is being held beyond the expiration of his maximum release
date.  He has not yet served his maximum sentence of 20 years as
imposed on December 17, 1987, pursuant to N.J.S.A. 2C:43-5, and
he is still serving his original sentence.  Therefore, Salaam has
not shown that he is being penalized twice for the same conduct
or receiving multiple punishments for the same offense, rendering
his double jeopardy claim meritless.  Accordingly, Grounds Four

and Seven of the petition, seeking release from prison based on
an alleged miscalculation of credits, is denied.

E.   Claim Seeking Transfer to Essex County Jail

     Finally, Salaam's claim seeking release to the Essex County
Jail must be denied.  A summary of Salaam's quarterly reviews,
progress reports, and disciplinary summaries demonstrate that
Salaam was repeatedly transferred from one institution to another
due to serious disciplinary infractions and poor/dangerous
behavior.  (Ex. E, Ra9-51).  His many infractions included
assaults, attempted assaults, fighting, indecent exposure,
disorderly conduct, escape, attempted escape, destroying,
altering, or damaging government property, disruptive conduct and
obscene language to a staff member, arson, and failure to perform
work.  (Ex. E, Ra9-13; Ra35-39; and Ex. F, Ra47-54).  On December
28, 1994, Salaam was moved to New Jersey State Prison, where he
forged official documents in an effort to obtain additional
credits.  He also continued with his disruptive behavior by
committing arson.  (Ex. E, Ra87-94).  From 1995 through 2003,
Salaam was transferred to and from East Jersey State Prison and
Northern State Prison, and then to South Woods State Prison.  His
disciplinary infractions continued, with charges of possession of
an unlawful weapon, possession of unauthorized keys, interference
with a head count, refusing mandatory testing, and fighting.
Thus, as a result of these numerous incidents of dangerous

39

behavior and disciplinary infractions, Salaam was placed in administrative segregation many times.  (Ex. E, Ra1; Ex. F, Ra23-30).

Given these demonstrated behavioral problems and dangerous disciplinary infractions, the State contends that Salaam should not be transferred to the Essex County Jail as requested. Respondents assert that the Essex County Jail is designed to house short term inmates; it is not an appropriate facility for high maintenance, dangerous felons like Salaam, where he will likely pose a threat to himself and others.  Salaam has also shown that he is at risk for escape.

In general, an inmate does not have a liberty interest in assignment to a particular institution or to a particular security classification.  See Wilkinson v. Austin, 125 S.Ct. 2384, 2393 (2005)(the Constitution does not give rise to a liberty interest in avoiding transfers to more adverse conditions of confinement); Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215, 224-25 (1976); Montayne v. Haymes, 427 U.S. 236, 243 (1976); Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976).  See also Sandin v. Connor, 515 U.S. 472, 484-86 (1995)(holding that a liberty interest is implicated only where the action creates "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or creates a "major disruption in his environment"); Kentucky Dept.

40

of Corrections v. Thompson, 490 U.S. 454, 463 (1989)(holding that a liberty interest arises only where a statute or regulation uses "explicitly mandatory language" that instructs the decision-maker to reach a specific result if certain criteria are met).

Pertinent to the claim asserted here, the Supreme Court has held:

> "The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another.  The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.
>
> Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system.  Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose."  Meachum, 427 U.S. at 224-25 (emphasis in original).

Moreover, the placement of state prisoners, such as Salaam in this instance, within the State prison system is among the "wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts."  Meachum, 427 U.S. at 225.  This Court concludes that the respondents' decision not to transfer Salaam to one of its less secure county jail facilities, due to Salaam's long and repetitive history of disruptive and dangerous behavior, is reasonably related to the State's legitimate governmental interest in managing its prison and jail facilities and maintaining security and administrative order.

41

Salaam has not alleged any facts to suggest that he may be entitled to placement in a low security facility pursuant to state statutory or regulatory law.  Moreover, he has been transferred to Northern State Prison in Newark, which is closer to his home in preparation for his eventual release.  Therefore, his claim for release to the Essex County Jail is denied.

## V.  CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  See Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by Salaam demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the foregoing reasons, this Court finds that Salaam's § 2254 habeas petition should be denied on the merits.  A certificate of appealability will not issue.   An appropriate Order accompanies this Opinion.


    /s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE
United States District Judge

DATED: July 20, 2005